IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WATERFORD TOWNSHIP
GENERAL EMPLOYEES
RETIREMENT SYSTEM,
Individually and On Behalf of All
Others Similarly Situated,

    Plaintiff,

     v.

COMPUCREDIT CORPORATION, et
al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:08-CV-2270-TWT

ORDER

This is a securities fraud class action.  It is before the Court on the Defendants'

Motion to Dismiss Plaintiff's Consolidated Class Action Complaint [Doc. 33].  For

the reasons set forth below, the Defendants' Motion is GRANTED.

I.  Background

CompuCredit Corporation provides financial services to consumers with low

credit scores.  It partners with various banks to offer credit cards to these consumers.

CompuCredit markets the credit cards, solicits applications, and establishes the terms

of the accounts, while the banks actually issue the credit cards and initially own the

accounts. By agreement, CompuCredit then purchases the accounts from the banks. CompuCredit also sells charged-off account receivables to financial companies. Charged-off receivables are unpaid credit card debts that have been written off as uncollectible and that are sold at a fraction of the original value. Some of the charged-off receivables sold by CompuCredit are receivables that CompuCredit purchases from other companies. The rest are receivables from the accounts that CompuCredit purchases from its partner banks. CompuCredit conducts its charged-off receivables business through its wholly-owned subsidiary, Jefferson Capital Systems, LLC. CompuCredit's other services involve auto finance and retail micro-loans.

CompuCredit has received substantial outside financing to grow its business. In January 2004, CompuCredit reached an agreement with Merrill Lynch & Co., Inc., for Merrill Lynch to provide CompuCredit with more than $2 billion in loans over a two year period. And in June 2005, CompuCredit reached an agreement with Encore Capital Group, Inc., for CompuCredit to sell Encore charged-off receivables. Pursuant to the agreement, CompuCredit sold Encore about $2.9 billion in current charged-off receivables and agreed to sell Encore up to $3.24 billion in future charged-off receivables. Encore paid CompuCredit $143 million for both the current and future charged-off receivables.

With the Merrill Lynch and Encore agreements in place, CompuCredit expanded its business and generated record earnings and growth for several years. This was reflected in the public statements of CompuCredit and its officers. On May 5, 2005, David G. Hanna, the Chairman of the Board and Chief Executive Officer of CompuCredit, described CompuCredit's strong earnings, its success in marketing credit cards, and its competitive strength in the charged-off receivables business:

> We are very pleased to report earnings for the first quarter of $49.2 million, or $0.94 per share. This represents a quarter-over-quarter net income increase of approximately 82% and an increase of 178% over last year's first quarter performance. Obviously, we are extremely happy with these results and the state of our business. In our largest business segment, credit cards, we have continued to have success in marketing both our sub-prime and near-prime products in the first quarter of 2005 adding a combined 256,000 accounts. We remain steadfast in our belief that the current economic climate is favorable for originating new growth, and we plan to continue to devote funding to marketing programs for our originated cards throughout 2005. Turning now to our Jefferson Capital debt-buying business, this segment had another strong quarter for us with over $7 million in pretax income, and we continue to be pleased with our returns in this area. We believe that Jefferson Capital has built a competitive advantage through combining its proprietary strategies with our management team's longstanding credit and collections expertise.

(Consolidated Class Action Compl. ¶ 91.) On May 8, 2006, Hanna reiterated his positive description of CompuCredit and emphasized that CompuCredit's growth was organic and sustainable:

> We're very pleased to report . . . earnings for the first quarter of $30.7 million or $0.61 per common share on a fully diluted basis. Our

managed earnings for the first quarter were $54.8 million or $1.09 per common share on a fully diluted basis. Our largest segments, Credit Cards, has experienced some strong tailwinds for most of the past few quarters and this past quarter was no exception. The competitive environment that we are see[ing] . . . [is] still rational in our opinion. We were extremely pleased by our new account additions as we added over 416,000 new credit card accounts for the first quarter, a sign that our promotions are seen as a viable and desired option for our customer base. . . . . Additionally, Jefferson Capital is about to enter the second year of its five-year forward-flow agreement with Encore Capital Group, an agreement under which Jefferson Capital resells the more traditional delinquency charge-offs that it purchases from our credit card operations and securitization trusts to Encore at a fixed-price. We continue to be pleased with the deal Jefferson Capital reached with Encore last June and we're certainly counting on continued growth in success from Jefferson Capital in future quarters. . . . . Our organic growth in the credit card business has been and continues to be very strong and we continue to prudently invest in diversification strategies for the long run.

(Id. ¶ 116.) Hanna's sentiment was shared by other CompuCredit officers and directors. For example, on November 2, 2005, J. Paul Whitehead, III, Chief Financial Officer of CompuCredit, expressed satisfaction about CompuCredit's historically strong financial position:

We are also quite pleased with our GAAP [Generally Accepted Accounting Principles] earnings results in the third quarter this year. Our GAAP earnings were favorably influenced by the securitization of . . . receivables, finance charges and fees generated by our on [sic] balance sheet credit card offering, and our second quarter 2005 auto finance segment acquisition. Our financial results continue to be stronger than at any time in our company's history and we expect continued success with the expansion of our business.

(Id. ¶ 104.)

About this time, however, CompuCredit caught the attention of state and federal regulators. By 2006, there were separate investigations of CompuCredit by the New York Attorney General (NYAG), the Federal Deposit Insurance Corporation (FDIC), and the Federal Trade Commission (FTC). These investigations targeted CompuCredit's marketing and debt collection practices. In June 2006, CompuCredit reached a settlement with the New York Attorney General. CompuCredit agreed to pay a civil penalty of $500,000 to the State of New York and to issue certain refunds to New York consumers. While insisting that CompuCredit's practices were legal, Hanna described this settlement as a good economic decision:

> Some of you recently may have read about our [June 2006] settlement with the New York Attorney General to resolve an investigation into some of our marketing and other materials and our servicing and collection practices. While we are highly confident that our marketing materials, our policies and procedures and our collection practices are substantially compliant with all laws and jurisdictions where we operate, including within the state of New York, we thought it was best to go ahead and settle this investigation for the same reason a company settles other types of issues. It made good economic sense, all things considered.

(Id. ¶ 127.) Hanna also described the FDIC investigation as routine and maintained that CompuCredit's practices were legal, while conceding that regulators may not agree:

> In light of the nature of our business – providing credit to underserved and un-banked consumers – regulatory reviews by state and federal authorities are common. For instance, the FDIC currently is conducting

an investigation of the policies, practices and procedures that we use in connection with our principal third-party credit card originating financial institution; we are cooperating with the FDIC in the investigation. Because this FDIC investigation is at an early stage, it is premature for us to determine the effects of this investigation on our financial condition, results of operations or business position and financial statements. While we believe we have the most comprehensive legal and other diligence processes within the industry to ensure the compliance of our marketing materials, servicing and collection practices and other program features with applicable law, the standards imposed on our business by applicable law and the regulators are at times subjective. As such, it is likely that, as part of any review by regulators from time-to-time, they will object to our marketing, servicing and collection practices, and there can be no assurance that the changes required to address concerns raised in the course of these reviews will not have a material adverse effect on our financial condition, results of operations or business.

(Id.)  From 2006 to 2008, CompuCredit continued to disclose the existence of the

FDIC and FTC investigations in its financial documents but repeatedly stated that its

"marketing and other materials and servicing and collection practices comply with

applicable law."

The FDIC and FTC investigations of CompuCredit's credit card practices ended

with administrative charges and a major lawsuit against CompuCredit.  On June 10,

2008, the FDIC filed administrative charges against CompuCredit and some of its

partner banks for using fraudulent practices to market their credit cards.  The FDIC

announced that:

The enforcement actions seek orders that would correct the [Federal Trade Commission Act] violations, and provide restitution to consumers

in the form of credits for certain fees and charges arising from the deceptive marketing practices.  It is estimated that such credits will exceed $200 million. . . . The FDIC is also seeking civil money penalties (CMPs) of $6.2 million against CompuCredit, and a total of $431,000 against First Bank of Delaware and First Bank & Trust.

(Id. ¶ 58.)  On the same day, the FTC filed a lawsuit against CompuCredit and Jefferson Capital for using fraudulent practices to market their credit cards and abusive practices to collect unpaid debt.  The FTC announced that:

The FTC alleges that CompuCredit violated the [Federal Trade Commission Act] by misrepresenting the amount of credit that would be available immediately to consumers, failing to disclose up-front fees, failing to disclose that certain purchases could reduce a consumer's credit limit, and misrepresenting a debt collection program as a credit card offer.  Jefferson Capital allegedly violated the [Federal Trade Commission Act] and [Fair Debt Collection Practices Act] by misrepresenting a debt collection program as a credit card offer and using abusive collection tactics such as making debt collection calls to individual consumers more than 20 times per day, including before 8 a.m. and after 9 p.m., and on Sundays.

(Id. ¶ 57.)  Following news of the administrative charges and lawsuit against CompuCredit, the price of CompuCredit's stock fell "by $2.49 per share, or approximately 28%, closing at $6.30 per share on June 10, 2008 on extremely high volume."  (Id. ¶ 61.)

The decline in CompuCredit's stock price prompted lawsuits by former stockholders.  On July 14, 2008, Waterford Township General Employees Retirement System filed a securities fraud class action against CompuCredit, David G. Hanna, J.

Paul Whitehead, III, Richard R. House, Jr., and Richard W. Gilbert.  <u>Waterford Twp.</u>

<u>Gen. Employees Ret. Sys. v. CompuCredit Corp.</u>, No. 1:08-CV-2687.  Defendants

Hanna, Whitehead, House, and Gilbert were and are still officers of CompuCredit.  On

August 22, 2008, R. Kyle Steinke filed a separate securities fraud class action against

the same Defendants.  <u>Steinke v. CompuCredit Corp.</u>, No. 1:08-CV-2270.  On

October 22, 2008, the Court consolidated these two actions and appointed the City of

Pontiac General Employees Retirement Systems as Lead Plaintiff. [Doc. 19].  In its

Consolidated Class Action Complaint, the Plaintiff asserts claims under section 10(b)

of the Securities Exchange Act of 1934 for false or misleading statements.  The

statements identified by the Plaintiff as false or misleading fall into the following

categories: statements about CompuCredit's earnings, statements about the strength

of CompuCredit's business, statements about the legality of CompuCredit's marketing

practices, and statements about the investigations of CompuCredit.  The Plaintiff says

that all of these statements were false or misleading because the Defendants failed to

disclose that CompuCredit's business "was entirely predicated on its fraudulent and

predatory marketing practices."  (Consolidated Class Action Compl. ¶ 77.)  The

Defendants now move to dismiss all of the Plaintiff's claims for failure to state a claim

upon which relief can be granted.

## II.  <u>Motion to Dismiss Standard</u>

A complaint must be dismissed if, even accepting all well pleaded factual allegations as true, it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Complaints that allege fraud under federal securities law must satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act of 1995. A complaint "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1347 (N.D. Ga. 2000) (citing Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)). A securities class action complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U. S. C. § 78u-4(b)(2). A strong inference is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).

## III. Discussion

Section 10(b) of the Securities Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange– . . . . (b) To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  SEC Rule 10b-5 implements section 10(b).  It provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  There is an implied private right of action against any person who violates section 10(b).  Tellabs, 551 U.S. at 318.  There is also a private right of action against any person that controls any person who violates section 10(b).  15 U.S.C. § 78t(a).

To state a claim under section 10(b) of the Securities Exchange Act for false or misleading statements, a plaintiff must allege the following: (1) a false or misleading statement, (2) of a material fact, (3) made with the required state of mind, (4) on which the plaintiff relied, and (5) that proximately caused the plaintiff's injury.

Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1197 (11th Cir. 2007). The Defendants say that the Plaintiff's claims should be dismissed because, except for reliance, the Plaintiff has failed to properly allege the elements of a securities fraud claim.

A.    False or Misleading Statement

In order to state a claim for securities fraud, there must be a false or misleading statement. For false or misleading statements based on the failure to disclose illegal activity, the allegations about the underlying illegal activity must also be stated with particularity. In re Mirant Corp. Sec. Litig., No. 1:02-CV-1467, 2009 WL 48188, at *17 (N.D. Ga. Jan. 07, 2009). The Plaintiff's allegations about CompuCredit's marketing practices are stated with particularity. The Plaintiff says that, while marketing its credit cards, CompuCredit misrepresented the amount of credit that would be available immediately to consumers, failed to disclose up-front fees, failed to disclose that certain purchases could reduce a consumer's credit limit, misrepresented a debt collection program as a credit card offer, and used abusive debt collection tactics. The Plaintiff has described these allegations with sufficient detail, providing the "who, what, when, where, and how" of CompuCredit's marketing practices. (Consolidated Class Action Compl. ¶¶ 34-48.) The Defendants say that the Plaintiff has not specified which state or federal laws CompuCredit violated. But, while that information would be helpful, it is not required. The Plaintiff's allegations

do not involve novel legal theories.  The Plaintiff accuses CompuCredit of ordinary consumer fraud that is prohibited in every state.

The allegations about the underlying illegal activity must also be reasonably related to the false or misleading misstatements.  "[A] duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public [requires] a connection between the illegal conduct and the statements beyond the simple fact that [a judgment against the corporation] would have an adverse impact upon the corporation's . . . bottom line."  In re AXIS Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 588 (S.D.N.Y. 2006).  The Plaintiff's allegations about CompuCredit's marketing practices are not reasonably related to the statements about CompuCredit's earnings.  Those statements are simply historical numbers, which are not disputed, about what CompuCredit earned during a given period of time.  The statements do not say or imply anything about the source of or reasons for CompuCredit's earnings.  See In re Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) ("[An] isolated statement of actual revenues allegedly generated by improper activities does not create Section 10(b) liability.").

The Plaintiff's allegations about CompuCredit's marketing practices, however, are reasonably related to the statements about the strength of CompuCredit's business,

the legality of CompuCredit's marketing practices, and the investigations about

CompuCredit.  Examples of these statements include the following:

- Jefferson Capital has built a competitive advantage through combining its proprietary strategies with our management team's longstanding credit and collections expertise. (Consolidated Class Action Compl. ¶ 91);
- The competitive environment that we are see[ing] . . . [is] still rational in our opinion. (Id. ¶ 116);
- [W]e added over 416,000 new credit card accounts for the first quarter, a sign that our promotions are seen as a viable and desired option for our customer base. (Id.)
- [W]e are highly confident that our marketing materials, our policies and procedures and our collection practices are substantially compliant with all laws and jurisdictions where we operate . . . . (Id. ¶ 127); and
- [R]egulatory reviews by state and federal authorities are common. (Id.)

See In re Craftmatic Sec. Litig., 890 F.2d 628, 640 (3d Cir. 1989) ("[T]he concerns

of the securities acts are implicated by allegations that the prospectus failed to disclose

. . . [that] the success of the advertising, promotion, and marketing program depended

on deceptive [and] illegal practices . . . ."); Libon v. Infineon Techs., AG, No.

3:04CV929, 2006 U.S. Dist. LEXIS 76430, at 21-22 (E.D. Va. Aug. 07, 2006) ("After

touting its competitiveness, the omission of [the defendant's] illegal price-fixing and

anti-competitive behavior from its public statements created a false impression.").

In addition to these generally optimistic statements, CompuCredit repeatedly

and truthfully disclosed the FTC and FDIC investigations and said that the

investigations "could affect the ability or willingness of the banks that issue [the Company's] products to continue or expand further their issuances of products on our behalf, thereby causing our goals to be unachievable."   (Whitesell Decl. Ex. 16). CompuCredit also disclosed that the investigations could result in a "material adverse effect on [the Company's] financial condition, results of operations or business." (Id.) The Plaintiff does not allege that CompuCredit knew that the FTC and FDIC investigations would result in the filing of enforcement actions against the company. Federal securities law does not require corporate executives to predict with absolute certainty the outcome of regulatory proceedings.   And public policy favors settlements.  In this context, the Plaintiff has not stated a plausible claim for relief.

B.    State of Mind

The false or misleading statement must be made with the required state of mind. The allegations must give rise to a strong inference that the defendant acted with an intent to defraud or with severe recklessness.  15 U. S. C. § 78u-4(b)(2); McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).  Severe recklessness is defined as:

> [H]ighly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure

> from the standards of ordinary care, and that present a danger of
> misleading buyers or sellers which is either known to the defendant or
> is so obvious that the defendant must have been aware of it.

Id.  Because a corporation does not have its own state of mind, the state of mind of its officials must be imputed to the corporation.  Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008).  A court should "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)."  Id.

The Plaintiff's allegations do not give rise to a strong inference that the individual Defendants acted with an intent to defraud or with severe recklessness.  A major weakness is that the Plaintiff's allegations do not show that the individual Defendants knew that CompuCredit's marketing practices were illegal.  For example, the Plaintiff does not say that there are internal CompuCredit documents that admit liability or even discuss the legality of their marketing practices.  As another example, the Plaintiff does not say that there are confidential witnesses who discussed or heard any CompuCredit officials discuss the legality of their marketing practices.  Indeed, to this day, CompuCredit maintains that its marketing practices were legal, the standards imposed on CompuCredit's industry are subjective, and the settlements were good economic decisions.  See In re AXIS Capital Holdings, 456 F. Supp. 2d at 592;

<u>Libon</u>, 2006 U.S. Dist. LEXIS 76430, at *30; <u>In re Marsh & McLennan</u>, 501 F. Supp. 2d at 483.

The Plaintiff says that the individual Defendants must have known that CompuCredit's marketing practices were illegal. The Plaintiff says that knowledge can be imputed because the individual Defendants were high level officers at CompuCredit. But "[i]t is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to [show state of mind]." <u>In re Sotheby's Holdings, Inc. Sec. Litig.</u>, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000). The Plaintiff also says that knowledge can be imputed because of the "core operations" doctrine. "[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." <u>Epstein v. Itron, Inc.</u>, 993 F. Supp. 1314, 1326 (E.D. Wash 1998). But, at most, this doctrine establishes that the individual Defendants knew the content of CompuCredit's marketing practices. It does not, however, also establish that the Defendants knew that those marketing practices were illegal. To establish that additional inference, the Plaintiff must first allege with particularity that someone at CompuCredit actually knew that CompuCredit's marketing practices were illegal. That knowledge could then be

imputed to the individual Defendants.  See Elam v. Neidorff, 544 F.3d 921, 929 (8th

Cir. 2008) ("[T]o attribute knowledge . . . to [the company's] officers . . . we would

at least require a showing that this information was known within the company at that

time."); In re Northpoint Commc'ns Group, Inc. Sec. Litig., 184 F. Supp. 2d 991, 998

(N.D. Cal. 2001).

     Another weakness is that the Plaintiff's allegations of motive are vague and

unspecific.  The Plaintiff says that the individual Defendants were motivated to

maintain CompuCredit's stock prices because their compensation was based in part

on equity in CompuCredit.  But the Plaintiff does not identify how CompuCredit's

compensation was any different from the standard incentive normally provided to

corporate officers.  "[S]tandard incentive compensation cannot be the sole basis on

which to [show state of mind]; otherwise executives of any major corporation could

and would be subject to allegations of fraud."  In re AFC Enters., Inc. Sec. Litig., 348

F. Supp. 2d 1363, 1374 (N.D. Ga. 2004).  The Plaintiff says that the individual

Defendants were motivated to generate new credit card accounts because of

CompuCredit's agreement with Encore regarding charged-off receivables.  But, again,

the Plaintiff does not identify how this agreement was any different from standard

business agreements.  "Generalized allegations of intent to maintain lucrative business

relationships and to establish new ones do not set forth a motive for [state of mind]

purposes." In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005).

Lastly, the Plaintiff says that unusual and suspicious stock sales confirm the allegations of motive. But for two of the Defendants–David G. Hanna (Chief Executive Officer) and Richard R. House, Jr. (President)–the Plaintiff does not identify any stock sales. "[T]he absence of allegations against key players refute any inference of [motive]." Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1336 (S.D. Fla. 2004). For another Defendant–Richard W. Gilbert (Chief Operating Officer)–the Plaintiff has not provided a meaningful trading history by which to evaluate the allegedly unusual and suspicious stock sales. "For individual defendants' stock sales to raise an inference of [motive], plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1005 (9th Cir. 2009). For the one Defendant–J. Paul Whitehead, III (Chief Financial Officer)–that the Plaintiff identifies stock sales and a meaningful trading history for, the Plaintiff fails to show that these sales were unusual or suspicious. Defendant Whitehead sold 192,000 shares of stock for proceeds of $5.8 million, representing 66% of his common stock holdings. But, while this amount is substantial, all of the sales occurred before November 10, 2005, which is more than two and a half years before the announcement on June 10,

2008, of the administrative charges and lawsuit against CompuCredit. "Significant gaps in time between a sale of stock and the announcement causing the stock price to decline may diminish the likelihood of [improper motive]." In re AFC Enters., 348 F. Supp. 2d at 1373.

Because of the weakness of the Plaintiff's allegations, the more plausible theory is that the individual Defendants believed that CompuCredit's marketing practices were legal, the standards imposed on CompuCredit's industry are subjective, and the settlements were good economic decisions. Therefore, the Plaintiff has failed to properly allege that the individual Defendants acted with the required state of mind. Because CompuCredit's state of mind is the state of mind of its officials, the Plaintiff also fails to properly allege that the Defendant CompuCredit acted with the required state of mind. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008).

C.    Proximate Causation

The false or misleading statement must proximately "cause[] the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "[A] person who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser for the loss the purchaser sustains when the facts become generally known and as a result share value depreciates." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 344 (2005) (internal quotation marks omitted). Based on the

Plaintiff's allegations, the Defendants' statements did not cause the Plaintiff City of Pontiac's loss. The City of Pontiac sold all of its CompuCredit stock by November 2007, which is more than seven months before the announcement on June 10, 2008, of the administrative charges and lawsuit against CompuCredit. The Plaintiff says that its proximate "causation allegations [are], in no way, limited to the June 10, 2008 disclosure," and that a series of partial disclosures by CompuCredit caused CompuCredit's stock price to decline over an extended period of time. But the Plaintiff's proximate causation allegations are, in fact, limited to the June 10, 2008 disclosure. As the Plaintiff describes in its Complaint:

> 55. Beginning around May 2007, however, the Company experienced negative performance, including a slow down in the addition of new accounts. This was the result of an overall market contraction due to the impending credit crisis. Nevertheless, <u>because Defendants' fraud remained concealed</u>, the Company's revenues, account growth and receivables, as well as its stock price were still artificially inflated by the Company's deceptive, predatory, and unlawful marketing practices.
> G. <u>The Truth is Revealed</u>
> 56. On June 10, 2008, the truth was finally revealed to the market.

(Consolidated Class Action Compl. ¶¶ 55-56) (emphasis added). The Plaintiff also does not mention any partial disclosures or describe the effect that those disclosures had on CompuCredit's stock price in its Complaint. If the Plaintiff bought the stock at an inflated price, it is just as likely that it sold at an inflated price. In fact, what is most likely is that any loss sustained by the Plaintiff was due to general market

conditions.  Therefore, the Plaintiff has failed to properly allege the Defendants' false or misleading statements proximately caused its loss.

## IV.  Conclusion

For the reasons set forth above, the Defendants' Motion to Dismiss Plaintiff's Consolidated Class Action Complaint [Doc. 33] is GRANTED.  The Plaintiff has leave to file an amended complaint within thirty days of this order. A redlined version of the amended complaint must be served upon opposing counsel and provided to the Court in chambers.  If no amended complaint is filed, the dismissal will be with prejudice.

SO ORDERED, this 3 day of December, 2009.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge